IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| James H. Street, | : | |
| | | Civil Case No. 2:12-cv-0203 |
| Petitioner | : | Criminal No. 2:07-cr-0082 |
| | | |
| v. | : | Judge Watson |
| | | |
| United States of America, | : | Magistrate Judge Abel |
| | | |
| Respondent | : | |

# Order

Petitioner James H. Street brings this action for writ of habeas corpus under 28 U.S.C. §2255.  This matter is before the Magistrate Judge on petitioner Streets' May 11, 2012 motion for discovery (doc. 115), May 18, 2012 motion to compel discovery (doc. 117), May 30, 2012 motions to compel discovery (doc. 121 and 122), July 16, 2012 motion for an evidentiary hearing (doc. 124), and January 10, 2013 motion to request chambers meeting (doc. 128).

<u>Background</u>. The petition alleges that on May 6, 2008, petitioner Street was convicted in the United States District Court for the for the Southern District of Ohio of mail fraud and making a false statement to law enforcement.  He was sentenced to a term of 41 months imprisonment and 3 years supervised release. Petitioner appealed the convictions, but on November 12, 2010 the United States Court of Appeals for the Sixth Circuit issued a decision affirming the judgment of conviction. Subsequently, the United States Supreme Court denied Street's petition for a writ of *certioari*.

The petitioner pleads the following grounds for relief:

A. Conviction is in violation of Honest Services Fraud Law under ruling of US Supreme Court and is Unconstitutionally Vague.
B. Insufficient Evidence exists to support conviction/sentence for Mail Fraud and Making False Statements.
C. Ineffective Assistance of Counsel.
D. Unlawful Enhancement for "7 checks" where enhancement was not based on reliable evidence under U.S.S.G. 6A1.3.

Doc. 104, PAGEID ## 1778-79. All claims except the ineffective assistance of counsel claim have been dismissed because they already have been presented to and ruled on by the Court of Appeals. April 13, 2013 Order (doc. 112).

Motion for chambers meeting (doc. 128). The motion for a chambers meeting is DENIED. Petitioner's arguments have been fully presented in his briefs. An oral presentation would not help resolve the issues raised by his motions to compel discovery.

Motions to compel discovery (docs. 115, 117, 121, 122, and 128).

A habeas corpus petitioner is not entitled to discovery as of right. *Bracy v. Gramley*, 117 S.Ct. 1793, 1796-97 (1997); *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). Under the provisions of Rule 6(a), Rules Governing Section 2255 Proceedings in the United States District Court, a petitioner "shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause grants leave to do so, but not otherwise." Discovery is warranted only where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief [.]" *Harris v. Nelson*, 394 U.S. 286, 299

(1969), quoted in *Bracy v. Gramley*, 117 S.Ct. at 1799; *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004).  When a petitioner fails to make "a fact specific showing of good cause under Rule 6," the court will deny the discovery requests as a mere fishing expedition. *Stanford v. Parker,* above; *Williams v. Bagley*, above. Rule 7, Rules Governing Section 2254 Cases, further limits discovery, allowing only the "addition of records which are relevant to the merits of a habeas corpus petition."

Here petitioner Streets maintains that he is not guilty of the crimes for which he was convicted. Those issues were litigated at trial, and the Court of Appeals found that there was sufficient evidence to prove each count for which he was convicted beyond a reasonable doubt. Because petitioner's discovery requests relate to the evidentiary issues at trial, the facts proved there are relevant to this decision. These facts were summarized by the United States Court of Appeals for the Sixth Circuit as follows:

> The Putnam companies are a trucking company and several related businesses. In July 2000, Putnam hired Mr. Streets to build and run the new brokerage business, Putnam Logistics. Putnam gave Mr. Streets a great deal of autonomy and discretion in developing and running Putnam Logistics.
> Unlike the rest of the Putnam businesses, Putnam Logistics did not use trucks owned or leased by Putnam. Instead, Putnam Logistics arranged shipments for a customer using third-party truckers and trucking companies. After receiving confirmation of delivery, Putnam Logistics would pay the third-party trucker. Putnam Logistics then would invoice the customer whose goods had been transported, and the customer would pay Putnam Logistics for the work. Putnam Logistics made a profit by charging the customer more than it paid the trucker to haul the load.
> At the time Putnam Logistics was formed, its billing system used software that prevented it from being integrated with the rest of the Putnam companies. Mr. Streets therefore was primarily responsible for the paperwork, payment systems, and billing systems for Putnam Logis-tics.

Ron Kunkel, an employee of Putnam, provided some oversight over some aspects of Putnam Logistics' billing. He was the only person auth-orized to write a check on behalf of Putnam Logistics. He also reviewed the monthly sales report, drafted by Mr. Streets, that showed all of Put-nam Logistics' shipments, customers, receivables, and payables. In add-ition, Mr. Kunkel had access to review the paper files related to the trip documents.

Although Mr. Streets could not write a Putnam check without Mr. Kunkel's authorization, Mr. Streets could issue payments in the form of T-Cheks. T-Cheks are a type of money order that can be cashed at truck stops. Moreover, Mr. Streets had the discretion to decide whether to pay a trucker by T-Chek. He also had the discretion to decide whether to pay only the trucker's advance expenses or the entire trip by T-Chek. The only review Putnam conducted of the T-Cheks was done by the accounting department, which merely reconciled a copy of the T-Chek Mr. Streets wrote against the debits the T-Chek company made against Putnam's account.

While Mr. Streets was managing Putnam Logistics, Mr. Kunkel noticed that some paper files were missing documents or contained only handwritten notations. Mr. Kunkel frequently noticed these types of discrepancies with particular carriers Mr. Streets used to deliver ship-ments for Hankook Tires, an important customer of Putnam, and almost always when Mr. Streets had paid the trucker by T-Chek. Mr. Kunkel was not particularly concerned about the problems, however, because all of the documents in a file always matched with regard to the type of ship-ment, who carried the shipment, and the amount that Mr. Streets said the carrier should be paid.

Mr. Streets' authority to pay truckers by T-Chek and his control over Putnam Logistics' billing and payment systems provided him with the vehicle to defraud Putnam. From August 2001 through March 2002, Mr. Streets paid truckers from a Putnam Logistics account but directed the customers to pay himself, through a business named Howard Logistics. Mr. Streets accomplished his scheme by placing in the Putnam Logistics files false invoices. The false invoices were to Hankook Tires in care of Translogistics, a non-existent entity. The invoices Mr. Streets actually sent to Hankook Tires for those same trips, however, directed Hankook Tires to pay Howard Logistics. Mr. Streets then deposited into his own bank account the checks that Hankook Tires paid to Howard Logistics.

After several months of these fraudulent transactions, Putnam Logistics' accounts receivable for the Translogistics/Hankook account began to increase. In January and February 2002, Putnam's vice president

-4-

and Mr. Kunkel asked Mr. Streets for an explanation of the accounts-receivable problem. Mr. Streets told them that Translogistics was in financial trouble and had not been remitting Hankook Tires' payments to Putnam Logistics. He assured them, however, that another company was planning to buy Translogistics and assume its liabilities. About a month later, Mr. Streets told them that Translogistics had been sold and that he would re-bill the new company for the amounts due to Putnam Logistics. Mr. Streets did not re-bill the new company, however, until Putnam's vice president insisted that he do it immediately. Mr. Streets then had new invoices prepared, but he sent them to a nonexistent address.

In March and April 2002, Putnam purchased a new billing system and integrated Putnam Logistics into the company-wide system. Mr. Streets was very reluctant to come onto the new billing system, which provided Putnam with more oversight over Putnam Logistics. It also forced Mr. Streets to input complete mailing addresses for each customer instead of the partial addresses he had put in the system for Translogistics. The complete addresses he entered for Translogistics in the new system were the false addresses that did not exist.

Mr. Streets resigned from Putnam Logistics in May 2002, shortly after Putnam completed the billing change. After Mr. Streets left Putnam Logistics, Mr. Kunkel attempted to collect the unpaid accounts and discovered that certain customers, including Hankook Tires, had been invoiced to pay Howard Logistics instead of Putnam Logistics. He also discovered three checks from "Translogistics Services," at a false address, that partially repaid Putnam Logistics for some of the trips. None of the checks or their paperwork named Mr. Streets, but the checks were written on his account as shown by the account numbers pre-printed on the checks.

Putnam contacted its attorney and the Zanesville Police about its discoveries. After doing so, Putnam began receiving several letters from Mr. Streets' alleged attorney, "J.S.D. Williard." Those letters offered various and conflicting explanations for the Hankook Tires account and included offers to pay unspecified outstanding bills. The author of the letters also threatened to sue Putnam for various claims. The author sent letters to claims adjustor Kimberly Morin of the Cincinnati Insurance Company, Putnam's bonding company for employee malfeasance, after Putnam made a claim with the company. Putnam also received letters that purported to be from Mathews Company to Jim Streets at Putnam Logistics. Those letters claimed to need copies of outstanding invoices related to discussions allegedly held with Mr. Streets the previous April. Mr. Streets later admitted that he had written these letters.

In January 2007, FBI Special Agent Drew McGonaghy interviewed Mr. Streets at his home in connection with his investigation of Putnam's complaint against Mr. Streets. During that interview, Mr. Streets stated that he had not taken any money that did not belong to him. Several days later, Special Agent McGonaghy and Mr. Streets met to review records related to the case. On that occasion, Mr. Streets informed Special Agent McGonaghy that he had to double broker the Hankook Tires account after Putnam Logistics lost a load of tires that were shipped to Hankook Tires. The Hankook Tires transportation manager did not know of any load intended for his company that Putnam lost. Mr. Streets also explained that he had paid a "portion of the profits" to Putnam Logistics in three checks totaling $13,720, and that he had made the payments under a contract between himself and Putnam. Although he agreed to produce that contract, he never actually produced it.

Special Agent McConaghy questioned Mr. Streets about a specific load delivery in August 2001, where Putnam Logistics paid Towns Transportation to deliver a load to Hankook Tires. Instead of checking his records, Mr. Streets told the agents that he, and not Putnam Logistics, had paid for the delivery. Mr. Streets admitted receiving payment from Hankook Tires for the trip, and that he had deposited the check into his checking account.

The agents presented Mr. Streets with a similar situation, where a Howard Logistics invoice was sent to MHF Metals, a Putnam Logistics customer. There, the payment went into Mr. Streets' account but Putnam Logistics paid to transport the goods. Mr. Streets had no explanation for thediscrepancy, but he guessed it was a clerical mistake. Even after being shown T-Cheks from Putnam Logistics paying the trucker for the MHF Metals load, Mr. Streets claimed that he had personally paid all of the truckers in every case where Howard Logistics sent an invoice. Mr. Streets had brought records with him, which he showed to the agents, but these records post-dated the time period Mr. Streets was employed at Putnam Logistics. Mr. Streets agreed to gather records relevant to the correct time period. He never did produce any records to the agents.

. . .

**A. Mail Fraud**

Mail fraud under 18 U.S.C. § 1341 involves three elements: "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so." United States v. Crossley, 224 F.3d 847, 857 (6th Cir. 2000) (internal quotation marks omitted).

This record contains evidence that Mr. Streets caused Putnam Logistics to pay the costs of certain trips while Mr. Streets, doing business as Howard Logistics, received payment from the customer for the same trip. The evidence of the fraud scheme included (1) more than $67,000 in payments by Putnam Logistics for the 76 trips at issue; (2) invoices that Mr. Streets mailed to Hankook Tires directing it to pay Howard Logistics instead of Putnam Logistics for those same trips; (3) evidence of dummy-accounts-receivable entries on Putnam's books to cover up the fraud; (4) evidence that Mr. Streets deposited Hankook Tires' checks in his personal account; and (5) evidence that Mr. Streets wrote letters and undertook other sloppy activities after-the-fact in an effort to cover his tracks. This evidence alone, taken in the light most favorable to the government, is sufficient to establish beyond a reasonable doubt the three elements of mail fraud. *See id.*

### B. Making False Statements

Making a false statement under 18 U.S.C. § 1001(a)(2) involves five elements: "(1) the making of a statement; (2) the falsity of such statement; (3) knowledge of the falsity of such statement; (4) relevance of such statement to the functioning of a federal department or agency; and (5) that the false statement was material." *United States v. Hixon*, 987 F.2d 1261, 1266 (6th Cir. 1993). The indictment identifies three separate false statements, and the jury (on special interrogatories) found Mr. Streets guilty with regard to each of the three statements.

In the first statement, Mr. Streets claimed to have a contract with Putnam to continue his own business as a broker. Mr. Streets contends that this statement was not material. Materiality under section 1001 is a question of law. *United States v. Chandler*, 752 F.2d 1148, 1150 (6th Cir. 1985). A statement is material when it has the natural tendency to influence, even if it did not actually influence the government agent. Id. at 1151. In fact, a statement can meet the materiality requirement even if the government agent knows that the statement is false. *United States v. LeMaster*, 54 F.3d 1224, 1230-31 (6th Cir. 1995).

This statement was material. See id.; Chandler, 752 F.2d at 1151. The government introduced evidence at trial that Putnam had no knowledge that Mr. Streets was doing business as Howard Logistics while he was starting and running Putnam Logistics. It further put forward evidence that Mr. Streets never would have been hired by Putnam if Putnam had known that he was running a competing business. Mr. Streets received the Hankook Tires' payments in the name of Howard Logistics; at trial he stated he was co-brokering some of the loads with Putnam. Accordingly, the existence of such a broker's contract would tend to show

that Putnam was aware that Streets operated a similar logistics business and that the company allowed him to broker loads for himself, despite working for Putnam Logistics. Mr. Streets' statement that he had such a contract would tend to influence the investigation into whether Mr. Streets had an intent to defraud his employer. The statement accordingly was material to the investigation. See id.

When the FBI confronted him with documents for a specific trip chosen at random, "Trip 2123," Mr. Streets made his second false statement, which was that he, not Putnam Logistics, had paid the trucker for the loan invoiced on Putnam invoice #1097 and Howard Logistics invoice #1047. Mr. Streets then followed up with his third false statement when he stated that he himself had paid all of the independent drivers for the loads that were brokered through Howard Logistics and that he had records to show it. Mr. Streets contends that there was insufficient evidence from which the jury could conclude that he made either of these statements knowingly and willfully. His contention is without merit.

Mr. Streets made both of these statements in a second FBI interview that was scheduled to give Mr. Streets an opportunity to present his records to support his version of events and to review specific Putnam records. The evidence was such that a jury could conclude, based on the circumstances and timing of the interview, that Mr. Streets was not merely mistaken when he stated without hesitation or qualification that he had paid for a particular trip and that he had paid for all of the trips. Mr. Streets declined to qualify his statement even when given the opportunity to review the records and evidence against him. He also failed to produce records that supported his statements, despite his promise to do so. The lack of such records supports the jury's conclusion that Mr. Streets was not merely mistaken, but he in fact had no reason to believe that he paid the truckers. Accordingly, there was sufficient evidence from which a jury could conclude that these two statements violated section 1001.

The jury needed to properly convict Mr. Streets of making only one false statement to uphold the conviction on this count. *See United States v. Dedman*, 527 F.3d 577, 598 (6th Cir. 2008)("[W]e uphold a conviction where there was sufficient evidence for at least one of the alleged false statements."). Here, however, there was sufficient evidence from which the jury could conclude that Mr. Streets made all three statements. Accordingly, we must affirm Mr. Streets' conviction under section 1001.

*United States v. James H. Streets,* (6th Cir. November 12, 2010 Decision), pp. 2-6 and 11-13, Doc. 30, PageID 1743-47 and 1752-54.

> The petition alleges that:
>
> Defense counsel failed to adequately investigate case prior to trial and to properly represent defendant during trial. Trial transcript is replete with instances where counsel failed to call necessary witnesses, introduce important evidence exhibits, properly inquire of jury at voir dire and make certain objections or motions to properly question witnesses on cross-examination. See further Memorandum Section D.

Petition, Ground three, pp. 5-6, Doc. 104, PageID 1778-79. Petitioner's memorandum supporting the petition asserts that Streets told court appointed defense counsel that he would search and attempt to locate business records for J. Howard & Associates/ Howard Logistics and sort out the records needed. He told defense counsel about the relationship of Mel Loeser to the charges and to Hankook Tire. Streets provided defense counsel with over 4,000 pages of documents from May 2007 into October 2007. Further, Streets told defense counsel that there was no basis for the criminal charges and that it should be a civil matter. However, according to petitioner's memorandum, defense counsel "was less than enthused." *Id.*, p. 72, PageID 1863. Streets had no confidence in defense counsel, who refused to be educated in what a freight broker did or how bills of lading worked. Petitioner asserts that defense counsel "was completely deficient as to the knowledge and abilities needed to defend Streets." *Id.*

Despite his lack of faith in his defense counsel, Streets continued to look for documents and prepared an outline for his attorney "that provided [a] full detailed account

of events as related to Streets, Loeser, Putman and all side bar matters with documentation to afford verification." *Id.*, p. 73, PageID 1864. However, defense counsel did not consult, investigate or review the outline and did not interview Mell Loeser and Mike Mardage of Hankook Tire as Streets requested. *Id.* The memorandum in support of the petition asserts that Loeser, who died in April 2008, would have given testimony that "would have been invaluable to this case as Loeser was at the core of this case." *Id.*, pp. 75-76, PageID 1866-67.

Petitioner further argues that defense counsel should have "subpoenaed the trip records for each of the Hankook shipping requests in" Defense Exhibit A and should have argued for the exhibits admission into evidence at trial. *Id.*, p. 77, PageID 1868. He further argues that defense counsel should have subpoenaed witnesses for trial, but he does not identify those witnesses or proffer testimony from them. *Id.*, p. 79, PageID 1870.

In response to the petition, the government offers the affidavit of Streets' counsel, Steven S. Nolder. Mr. Nolder acknowledges that Streets asked him to contact Mel Loeser, but further states:

> I vividly remember calling Loeser . . . , he answered the phone and identified himself, and I told him why I was calling. Loeser was abrupt and said, "I'm not gonna talk to you" and that was the end of the conversation. I related this information to Streets who, as I recall, had no reaction. In a letter to USPO Beth Harris dated June 20, 2008, attached hereto as "Ex. 1", Streets acknowledged that I contacted Loeser, although he characterized the contact as "unknown to me (meaning streets) at the time." In his letter, Streets also wrote about the terse interaction that occurred between Loeser

>and me. Streets concluded his letter to Officer Harris by noting that he
>instructed Loeser to not "accept anyone's calls again."

Steven S. Nolder's May 25, 2012 Affidavit, ¶ 5(A), Doc. 120-1, PageID 2836. As to Mike Mardaga, Nolder states that he does not recall Streets asking him to contact him. Mardaga was the government's second witness at trial. Further,

>On direct examination, Mardaga identified and explained some Honkook
>records and checks that were part of the government's exhibits 1 through
>76 that documented the 76 trips that wre part of the alleged mail fraud
>scheme. I was quite familiar with those records and used them to effect-
>ively cross-examine Mardaga. While Mardage, in his testimony provided
>information useful to Street's defense; given the theory of Street's defense,
>I cannot conceive of a witness employed by Hankook who would have
>had any relevant information to bolster Street's case-in-chief.

*Id.*, ¶ 5(B). PageID 2837.

Nolder acknowledges that Streets prepared an outline with documentation for him and asserts:

>I reviewed all information given to me by Mr. Streets and used the docu-
>ments that I believed were relevant to our theory of defense. I made a
>number of charts and graphs that enhanced my understanding of both the
>documentation that Streets gave me as well as that provided by the gobt
>during discovery. I spent many hours reviewing and organizing these
>documents. . . . Much of Street's documentation was for periods before or
>after the relevant time period alleged in the indictment and did not pro-
>vide a defense to the charges.

*Id.*, ¶ 6(A), PageID 2837. In response to petitioner's argument that he failed to gather important documents and failed to call witnesses, Nolder states:

>(A)  Mr. Streets' defense to the claim of fraud was quite simple: either he
>or his companies paid the truckers for the deliveries and that he was
>therefore entitled to receive and keep the payments from Hankook Tires.
>Streets gave me many documents and check stubs attempting to shose

-11-

> payments. I made a large binder of those documents and organized them as to type of of payment since they did not directly match, either by date or amount, the 'trips' challenged by the government as fraudulent. Streets was solely responsible for matching these payments to the specific trips. I spent countless hours reviewing and organizing these documents but there was no direct correlation between the payments that Streets alleged he made to the truckers and the particular 'trip' for which Putnam or Putnam Logistics had clearly paid the truckers.
>
> (B) In addition to the witnesses discussed earlier, the only witnesses that Streets and I discussed calling were the truckers who hauled the Hankook Tires loads. Streets believed they would testify that he paid them for the trips in question. The problem with Street's theory, as I pointed out, was that Putnam an Putnam Logistics had cancelled checks and/or "T-checks" for each trip clearly showing that they paid the invoiced amount to the truckers. If the truckers would testify in a manner consistent with Street's theory, then thy would have to acknowledge they were double paid for the trip and would owe either Streets or Putnam a refund. Upon realizing this, Streets agreed that the truckers would not be good witnesses to pursue.

*Id.*, ¶ 7, PageID 2838.

Petitioner Streets did not verify his memorandum supporting his petition and he has not provided a declaration or affidavit controverting any of the facts asserted in Mr. Nolder's affidavit.

The standard for determining whether counsel's assistance was so defective as to deny a defendant the effective assistance of counsel guaranteed by the Constitution is in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a

> defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. With respect to the first prong of the Strickland test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. ... Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689. As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.

From a review of the record, the Magistrate Judge concludes that petitioner has failed to demonstrate good cause under Rule 6(a),  Rules Governing Section 2255 Proceedings in the United States District Court to conduct discovery.

Motion for evidentiary hearing (doc. 124). For the reasons set out above, petitioner has failed to demonstrate good cause for discovery or grounds for an evidentiary hearing under Rule 8(a),   Rules Governing Section 2255 Proceedings in the United States District Court. The motion is DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P. and Eastern Division Order No. 91-3, pt. F, 5, either party may, within fourteen (14) days after this Order is filed, file and serve on the opposing party a motion for reconsideration by the District Judge.  The motion must specifically designate the order, or part thereof, in question and the basis for any objection thereto.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

                                                                 s/Mark R. Abel
                                                                 United States Magistrate Judge