**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JAMES HOWARD STREETS,**

                                               **CASE NO. 2:12-CV-00203**
     **Petitioner,**                       **CRIM. NO. 07-CR-00082**
     **v.**                                 **JUDGE MICHAEL H. WATSON**
                                                 **MAGISTRATE JUDGE ABEL**

**UNITED STATES OF AMERICA,**

     **Respondent.**

## <u>Report and Reccomendation</u>

Petitioner, a federal prisoner, brings the instant motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.  This matter is before the Court on the instant motion, Petitioner's *Addendum*[1] and brief in support, Respondent's *Return of Writ*, and exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the § 2255 petition be **DENIED** and that this action be **DISMISSED**.

## Facts:

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of this case as follows:

> The government prosecuted Defendant James Streets for carrying out a two-year scheme to defraud his employer by diverting customer payments from his employer to himself. According to the government, Mr. Streets also made materially false statements to the investigators handling the case for the Federal Bureau of Investigation. The matter culminated in a trial where the jury found Mr. Streets guilty as charged of both mail fraud and making a materially false statement to the government. Mr. Streets appealed. For the reasons given below, we affirm his sentence and conviction.

---

[1] In his Addendum, Petitioner reiterates all of the arguments he presented in his initial habeas corpus petition.

FACTS

I. Background

The Putnam companies are a trucking company and several related businesses. In July 2000, Putnam hired Mr. Streets to build and run the new brokerage business, Putnam Logistics. Putnam gave Mr. Streets a great deal of autonomy and discretion in developing and running Putnam Logistics.

Unlike the rest of the Putnam businesses, Putnam Logistics did not use trucks owned or leased by Putnam. Instead, Putnam Logistics arranged shipments for a customer using third-party truckers and trucking companies. After receiving confirmation of delivery, Putnam Logistics would pay the third-party trucker. Putnam Logistics then would invoice the customer whose goods had been transported, and the customer would pay Putnam Logistics for the work. Putnam Logistics made a profit by charging the customer more than it paid the trucker to haul the load.

At the time Putnam Logistics was formed, its billing system used software that prevented it from being integrated with the rest of the Putnam companies. Mr. Streets therefore was primarily responsible for the paperwork, payment systems, and billing systems for Putnam Logistics. Ron Kunkel, an employee of Putnam, provided some oversight over some aspects of Putnam Logistics' billing. He was the only person authorized to write a check on behalf of Putnam Logistics. He also reviewed the monthly sales report, drafted by Mr. Streets that showed all of Putnam Logistics' shipments, customers, receivables, and payables. In addition, Mr. Kunkel had access to review the paper files related to the trip documents.

Although Mr. Streets could not write a Putnam check without Mr. Kunkel's authorization, Mr. Streets could issue payments in the form of T–Cheks. T–Cheks are a type of money order that can be cashed at truck stops. Moreover, Mr. Streets had the discretion to decide whether to pay a trucker by T–Chek. He also had the discretion to decide whether to pay only the trucker's advance expenses or the entire trip by T–Chek. The only review Putnam conducted of the T–Cheks was done by the accounting department, which merely reconciled a copy of the T–Chek Mr. Streets wrote against the debits the T–Chek company made against Putnam's account.

While Mr. Streets was managing Putnam Logistics, Mr. Kunkel noticed that some paper files were missing documents or contained only handwritten notations. Mr. Kunkel frequently noticed these types of discrepancies with particular carriers Mr. Streets used to deliver shipments for Hankook Tires, an important customer of Putnam, and almost always when Mr. Streets had paid the trucker by T–Chek. Mr. Kunkel was not particularly concerned about the problems, however, because all of the documents in a file always matched with regard to the type of shipment, who carried the shipment, and the amount that Mr. Streets said the carrier should be paid.

Mr. Streets' authority to pay truckers by T–Chek and his control over Putnam Logistics' billing and payment systems provided him with the vehicle to defraud Putnam. From August 2001 through March 2002, Mr. Streets paid truckers from a Putnam Logistics account but directed the customers to pay himself, through a business named Howard Logistics. Mr. Streets accomplished his scheme by placing in the Putnam Logistics files false invoices. The false invoices were to Hankook Tires in care of Translogistics, a non-existent entity. The invoices Mr. Streets actually sent to Hankook Tires for those same trips, however, directed Hankook Tires to pay Howard Logistics. Mr. Streets then deposited into his own bank account the checks that Hankook Tires paid to Howard Logistics.

After several months of these fraudulent transactions, Putnam Logistics' accounts receivable for the Translogistics/Hankook account began to increase. In January and February 2002, Putnam's vice president and Mr. Kunkel asked Mr. Streets for an explanation of the accounts-receivable problem. Mr. Streets told them that Translogistics was in financial trouble and had not been remitting Hankook Tires' payments to Putnam Logistics. He assured them, however, that another company was planning to buy Translogistics and assume its liabilities. About a month later, Mr. Streets told them that Translogistics had been sold and that he would re-bill the new company for the amounts due to Putnam Logistics. Mr. Streets did not re-bill the new company, however, until Putnam's vice president insisted that he do it immediately. Mr. Streets then had new invoices prepared, but he sent them to a nonexistent address.

In March and April 2002, Putnam purchased a new billing system and integrated Putnam Logistics into the company-wide system. Mr. Streets was very reluctant to come onto the new billing system, which provided Putnam with more oversight over Putnam Logistics. It also forced Mr. Streets to input complete mailing

addresses for each customer instead of the partial addresses he had put in the system for Translogistics. The complete addresses he entered for Translogistics in the new system were the false addresses that did not exist.

Mr. Streets resigned from Putnam Logistics in May 2002, shortly after Putnam completed the billing change. After Mr. Streets left Putnam Logistics, Mr. Kunkel attempted to collect the unpaid accounts and discovered that certain customers, including Hankook Tires, had been invoiced to pay Howard Logistics instead of Putnam Logistics. He also discovered three checks from "Translogistics Services," at a false address, that partially repaid Putnam Logistics for some of the trips. None of the checks or their paperwork named Mr. Streets, but the checks were written on his account as shown by the account numbers pre-printed on the checks.

Putnam contacted its attorney and the Zanesville Police about its discoveries. After doing so, Putnam began receiving several letters from Mr. Streets' alleged attorney, "J.S.D. Williard." FN1 Those letters offered various and conflicting explanations for the Hankook Tires account and included offers to pay unspecified outstanding bills. The author of the letters also threatened to sue Putnam for various claims. The author sent letters to claims adjustor Kimberly Morin of the Cincinnati Insurance Company, Putnam's bonding company for employee malfeasance, after Putnam made a claim with the company. Putnam also received letters that purported to be from Mathews Company to Jim Streets at Putnam Logistics.FN2 Those letters claimed to need copies of outstanding invoices related to discussions allegedly held with Mr. Streets the previous April. Mr. Streets later admitted that he had written these letters.

FN1. The letters use an address that Mr. Streets used for his business. J.S.D. Williard is the name of Mr. Streets' step-son, who is not a lawyer and who denied any knowledge of the letters.

FN2. Gretchen Mathews is defendant's step-daughter and lived at the address written on the letter at the time the letter was sent. She knew nothing about the letter or Mathews Company.

In January 2007, FBI Special Agent Drew McGonaghy interviewed Mr. Streets at his home in connection with his investigation of Putnam's complaint against Mr. Streets. During that interview, Mr. Streets stated that he had not taken any money that did not belong to him. Several days later, Special Agent

McGonaghy and Mr. Streets met to review records related to the case. On that occasion, Mr. Streets informed Special Agent McGonaghy that he had to double broker the Hankook Tires account after Putnam Logistics lost a load of tires that were shipped to Hankook Tires. The Hankook Tires transportation manager did not know of any load intended for his company that Putnam lost. Mr. Streets also explained that he had paid a "portion of the profits" to Putnam Logistics in three checks totaling $13,720, and that he had made the payments under a contract between himself and Putnam. Although he agreed to produce that contract, he never actually produced it.

Special Agent McGonaghy questioned Mr. Streets about a specific load delivery in August 2001, where Putnam Logistics paid Towns Transportation to deliver a load to Hankook Tires. Instead of checking his records, Mr. Streets told the agents that he, and not Putnam Logistics, had paid for the delivery. Mr. Streets admitted receiving payment from Hankook Tires for the trip, and that he had deposited the check into his checking account.

The agents presented Mr. Streets with a similar situation, where a Howard Logistics invoice was sent to MHF Metals, a Putnam Logistics customer. There, the payment went into Mr. Streets' account but Putnam Logistics paid to transport the goods. Mr. Streets had no explanation for the discrepancy, but he guessed it was a clerical mistake. Even after being shown T–Cheks from Putnam Logistics paying the trucker for the MHF Metals load, Mr. Streets claimed that he had personally paid all of the truckers in every case where Howard Logistics sent an invoice. Mr. Streets had brought records with him, which he showed to the agents, but these records post-dated the time period Mr. Streets was employed at Putnam Logistics. Mr. Streets agreed to gather records relevant to the correct time period. He never did produce any records to the agents.

II. Mr. Streets' Indictment and Trial

In April 2007, the grand jury indicted Mr. Streets on a charge of mail fraud, in violation of 18 U.S.C. § 1341, and on a charge of making one or more materially false statements, in violation of 18 U.S.C. § 1001(a)(2). In support of the second count, making a materially false statement, the government specified three separate false statements that it alleged supported the charge. Mr. Streets' trial commenced on April 28, 2008.

An FBI analyst who had reviewed and summarized all of the documents relating to the 76 instances where Hankook Tires had paid Mr. Streets, acting as Howard Logistics, testified at trial.FN3 At trial, the analyst demonstrated generally how the brokerage system was supposed to work, how Mr. Streets received payments from customers, and the total amounts of Mr. Streets' fraud scheme. He also testified about how the fraud scheme worked in the context of one particular mailing that was charged in the indictment, which resulted in a Hankook Tires check to Howard Logistics in April, 2002, in the amount of $11,292.58. The documents related to that trip and check were in government exhibits 67 through 76. See Appx. Vol. VIII at 1503–04.

FN3. The summary stated that: (1) the payments Mr. Streets received totaled $96,554.19; (2) each of the 13 checks were deposited into Mr. Streets' bank account; and (3) Mr. Streets had paid back to Putnam Logistics $13,720 in three checks that were made to appear to come from the non-existent Translogistics, but that had actually been drawn on Mr. Streets' account. The FBI analyst also reviewed and summarized all of the documents showing that Putnam Logistics was billed and paid the truckers, at a minimum, $67,747 for those 76 trips.

In his defense, Mr. Streets asserted that he, not Putnam Logistics, had paid for the deliveries. Thus, according to Mr. Streets, he was entitled to the payments he received from Hankook Tires. As support, Mr. Streets put forward numerous documents, although none of the documents were originals. Many of the documents were not dated, other than dates that Mr. Streets had subsequently added prior to trial. Only a few bills from truckers were included in the documents, and there were no checks or T–Cheks that matched the amount, date, and trucker involved in any of the 76 charged trips.

As additional evidence that Mr. Streets, not Putnam Logistics, had personally paid some of the truckers for the Hankook Tires trips, Mr. Streets introduced checks drawn on his personal account that were written to "SLC." Mr. Streets testified that he knew from professional experience that SLC is a factoring company.FN4 He attempted to link his payments to SLC to some shipments for which Hankook Tires paid him instead of Putnam Logistics, and he testified that his payments to SLC were evidence that he, not Putnam Logistics, had paid for the trips. Mr. Streets later admitted at trial, however, that SLC actually is the Student Loan Commission and that he had written the checks to pay his own student loans.

FN4. A factor or factoring company is a company that provides an advance to a trucker and then collects from persons who hire the trucker payments that are made to the trucker.

The jury found Mr. Streets guilty on both counts. On the jury verdict form, the jury answered interrogatories as to each of the three false statements alleged in Count Two and found that all three statements violated the statute. The district court then held sentencing hearings in November 2008, January 2009, and March 2009. It sentenced Mr. Streets to 41 months imprisonment on each count to run concurrently and three years of supervised release. It also ordered Mr. Streets to pay $212,145.60 in restitution. The written judgment on that sentence was filed March 25, 2009. Mr. Streets timely appealed.

*United States v. Streets*, 401 Fed.Appx. 81, 82-86 (6th Cir. Nov. 12, 2010).  On November 12, 2010, the Court of Appeals affirmed Petitioner's convictions and sentence.  *Id.*  On May 16, 2011, the United States Supreme Court denied Petitioner's petition for a writ of *certiorari. Streets v. United States,* 131 S.Ct. 2472 (2011).

On March 7, 2012, Petitioner John Howard Streets filed the instant motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.  He asserts that his convictions violate "Honest Services Fraud Law" and are unconstitutionally vague; that there is insufficient evidence to support his convictions; that he was denied effective assistance of counsel;  and that the Court improperly enhanced his sentence  under U.S.S.G. § 6A1.3.  *See* Doc. No. 104.  All of these claims, with the exception of Petitioner's claim of ineffective assistance of counsel, have already been addressed on direct appeal.  Therefore, the sole remaining claim before this Court is that of the denial of the effective assistance of counsel.  *See Order*, April 13, 2012, Doc. No. 112.

It is the position of the Respondent that Petitioner's claims of ineffective assistance of counsel fail to provide a basis for habeas corpus relief.

7

**Ineffective assistance of counsel:**

Petitioner asserts he was denied effective assistance of counsel because his attorney failed to investigate, call witnesses, introduce exhibits, properly conduct *voir dire,* object at trial, file motions or properly question witnesses on cross-examination, and refused to educate himself regarding the charges at issue.

In *Strickland v. Washington*, the Supreme Court reiterated that the right to counsel guaranteed by the Sixth Amendment is the "right to effective assistance of counsel." 466 U.S. 668, 686 (1984.) To prevail on a complaint of ineffective assistance of counsel, a petitioner must demonstrate the following:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687. Scrutiny of defense counsel's performance must be "highly deferential." *Id*. at 689.

Given the difficulties "inherent" the analysis of whether an attorney's performance was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...." *Id*. Nevertheless, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 692. A petitioner, therefore, must show prejudice in order to prevail on a claim of ineffective assistance of counsel. *Id*. at 693.  To do so, a petitioner must demonstrate that a reasonable probability exists that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that he has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

*Harrington v. Richter*, 131 S.Ct. 770, 788-89 (2011).

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ——, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Stricklan*d, 466 U.S., at 689–690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

*Id.* at 788-89.

Petitioner Street's former attorney, Federal Public Defender Steven Nolder, has prepared an affidavit in response to his allegations that Nolder denied him the effective assistance of counsel. *Affidavit of Steven Nolder, Exhibit 1 to Return of Writ.* Nolder indicates that, since 1995, his practice has included only criminal defense work. In April 2007, he was appointed to represent Streets at trial and at sentencing in this case. In March 2012, he learned that Streets had filed this motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. After Streets waived his attorney-client privilege, Nolder prepared his *Affidavit* in response, the relevant aspects of which will be discussed below.

Petitioner contends that his attorney failed to review over 4000 pages of documents and an outline provided by Him, and therefore lacked sufficient knowledge of the charges. He complains that his attorney advised him to enter a guilty plea. He asserts that his attorney performed in a constitutionally ineffective manner by advising him that the government would file additional charges involving money laundering in connection with Streets's purchase of a home in Virginia in his wife's name if He decided against entering a guilty plea. Petitioner asserts that his attorney improperly failed to investigate or contact "Loeser," who is now deceased, or employees of Hankook Tire and Mardaga as potential defense witnesses. According to Streets, defense counsel failed to gather and introduce documents and failed to call witnesses, including Hankook representatives, transportation lawyers and analysts, Putnam employees, and various truck carrier owners. *Petition*, PageID #1867. Petitioner also complains that his attorney requested continuances of the trial date.

Nolder has responded in relevant part to these allegations as follows:

10

> It is true that Streets requested that I contact Mel Loeser who, he
> claimed, would have information regarding the brokering of the
> loads of Hankook tires that were the subject of Street's criminal
> prosecution.

*Affidavit of Steven Nolder, Exhibit 1 to Return of Writ.* Nolder states that Streets provided him

with phones numbers for possible contacts for Loeser, but Loeser refused to speak with him. *Id.*

He relayed this information to Streets, who had no reaction. In a letter to United States

Probation Officer, Beth Harris, dated June 20, 2008, Petitioner acknowledges that his attorney

contacted Loeser.[2]

Defense counsel never contacted Mike Mardaga prior to trial, but he has no recollection

of Streets asking him to make this contact. The government called Mardaga as a prosecution

witness, and Mardaga identified and explained Hankook records and checks that were a part of

the government's exhibits that documented the 76 trips that were a part of the alleged mail fraud

scheme. Given the theory of the defense, Nolder "could not conceive" of how a Hankook

employee could provide any exculpatory information for the defense. *Id.*

Nolder indicates that he reviewed all information Streets provided to him, and used the

documents he thought were relevant to the theory of defense. He made a number of charges and

graphs to increase his understanding of both the documentation Streets provided, as well as that

provided by the government in discovery. He spent many hours reviewing and organizing these

documents. Much of the documentation Streets provided was for periods before or after the

relevant time period alleged in the indictment and did not assist the defense. *Id.*

Nolder indicates that it was difficult to meet with Streets. He failed to respond to calls,

although defense counsel made numerous calls to Streets in an attempt to reach Him. Defense

counsel scheduled over 28 meetings with Streets during the course of his representation, many of

---

[2] This letter is attached to the *Return of Writ*, and is discussed below.

which he even failed to attend. Streets failed to show for a Sunday scheduled meeting, leaving a message that he would not attend. Defense counsel eventually became "so frustrated with Street's failure to cooperate that [he] asked the court to intervene in order to impress upon [him] the need to cooperate[.]" At a January 8, 2008, hearing, the Court so advised Streets, but he continued to miss meetings and was difficult to reach, although he did assist in preparing a defense. *Id.*

The theory of the defense the fraud charges was that Streets or his companies paid the truckers for the deliveries and He therefore was entitled to receive and keep the payments from Hankook Tires. Defense counsel reviewed numerous check stubs and documents attempting to show these payments, organized the same, and spent "countless hours" reviewing and organizing the documents, but found no direct correlation between the payments Streets alleged he made to the truckers and the particular trip for which Putnam or Putnam Logistics had paid truckers.

In response to Petitioner's allegation that defense counsel failed to introduce important documentation and failed to call witnesses, specifically Hankook representatives, transportation lawyers and analysts, Putnam employees and truck carrier owners, Nolder states that truckers who hauled Hankook Tires loads would not have assisted the defense, but would have provided incriminating evidence against him. The truckers would have had to acknowledge they had been double paid for the trip and owed a refund to Putnam. After reviewing these facts with Streets, he agreed calling truckers as defense witnesses would not assist the defense. *Affidavit of Steven Nolder, Exhibit 1 to Return of Writ.*

Defense counsel did not perform in a constitutionally unreasonable manner by conveying the terms of the government's plea offer, advising Streets of his opinion of his chances of acquittal at trial, or of whether he should consider entering a guilty plea in view of the evidence

against him.  Likewise, counsel did not perform in an inadequate manner by advising Streets that the government was investigating additional charges against Streets, which might be filed regardless of whether he accepted the terms of a guilty plea agreement.

Defendants have a constitutional right to the effective assistance of counsel during plea negotiations.  *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985).  A defendant challenging his attorney's conduct during the plea-bargaining stage bears "a heavy burden."  *Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005). He "must show that counsel did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence." *Short v. United States*, 471 F.3d 686, 692 (6th Cir.2006) (internal quotation marks omitted).  The record simply fails to support Petitioner's claim that such were the circumstances here.

Moreover, a criminal attorney is obligated to provide the advice about which Petitioner complains.  An attorney "has a clear obligation to fully inform her client of the available options." *Smith v. United States,* 348 F.3d 545, 552 (6th Cir.2003).  The duty of defense counsel to consult is paramount when a client has to decide whether or not to waive a constitutional right, such as the right to trial." *Miller v. Straub*, 299 F.3d 570, 580 (6th Cir. 2002).  During the plea negotiations stage,

> A criminal defendant has a right to expect. . .  that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available.

*Smith,* 348 F.3d at 553 (citation omitted); *see also Moss v. United States*, 323 F.3d 445, 474 (6th Cir.2003) (holding that failure of defense counsel to "provide professional guidance" regarding a defendant's sentencing exposure may constitute deficient assistance).

Neither the petition nor Petitioner's briefs point to evidence sufficient, if credited, to prove that Street's attorney failed to conduct an adequate investigation. There is no evidence supporting Petitioner's assertion that his attorney performed in a constitutionally ineffective manner at trial due to his failure to investigate the charges. Defense counsel has attached a document indicating the hours he spent working on his case, contradicting the allegation that defense counsel failed to conduct any investigation into the charges. *See Exhibits to Return of Writ*. A court is not required to scour a voluminous record in to ascertain the basis for a petitioner's claim that lack of investigation or pre-trial preparation burdened the defense. U*duko v. Cozzens*, No. 11-13765, 2012 WL 5830217, at *5 (E.D. Mich. Sept. 21, 2012)(citing *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)("[A] court need not make a party's case by scouring the various submissions to piece together appropriate arguments.") *See also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)(same).

The record does not support Petitioner's allegations that the witnesses he refers to would have assisted his defense. As stated by defense counsel, in a letter dated June 20, 2008, Petitioner acknowledges that his attorney contacted Mel Loeser, and that he told Loeser not to accept defense counsel's calls. *See Exhibits to Return of Writ*. Consequently, the allegations that defense counsel failed to contact this witness is not credible. Further, Loeser testified as a prosecution witness and was subjected to cross examination by defense counsel. Petitioner, therefore, cannot establish prejudice under the *Strickland* test based on his attorney's failure to call Loeser as a defense witness. Petitioner likewise cannot establish prejudice from his attorney's decision to request a continuance of the trial date in order better to prepare for trial.

Judicial scrutiny of defense counsel's performance in a criminal trial is highly deferential:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

> counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of professional assistance, that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy.

*Strickland v. Washington*, 466 U.S. at 689. Petitioner has not done so here.

While an attorney has a duty to consult with his client, that obligation does not require him to obtain his consent to every tactical decision. *Florida v. Nixon*, 543 U.S. 175 (citing *Taylor v. Illinois*, 484 U.S. 400, 417–418 (holding that an attorney has authority to manage most aspects of the defense without obtaining his client's approval.) The Sixth Amendment is violated only if counsel's acts or omissions "were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690. "Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." *Id.*

Petitioner contends that he was denied his Sixth Amendment right to court-appointed representation because he fired his attorney and wanted new counsel, but the Court refused his request. *Petition,* PageID #1866. In response to this allegation, Nolder states that Streets never indicated to him that he wanted to fire him or wanted new counsel appointed, though they did have disagreements regarding the case. Streets understood he could hire the counsel of his choice at any time.

The Sixth Amendment right to effective assistance of counsel includes the "right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez–Lopez*, 548 U.S. 140, 144 (2006) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). However, a criminal defendant's right to the attorney of his choice is "circumscribed in several important respects." *Id.* at 144 (quoting *Wheat v. United States*, 486 U.S. at 159). "[T]he right to counsel of choice does not

extend to defendants who require counsel to be appointed for them. *United States v. Gonzalez–Lopez, 548 U.S. at 151–52 (*citing *Wheat,* 486 U.S., at 159; *Caplin & Drysdale*, 491 U.S., at 624, 626). A trial court has wide latitude in balancing the right to counsel of choice against the needs of fairness and the demands of its calendar. *Id* . (citing *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983). "The court has, moreover, an 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *Id*. ( citing *Wheat,* at 159, 486 U.S. 153.) Additionally,

> [n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. See *Chambers v. Maroney*, 399 U.S. 42, 53–54, 90 S.Ct. 1975, 1982–1983, 26 L.Ed.2d 419 (1970). Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).

*Morris v. Slappy*, 461 U.S. 1, 11–12 (1983). The Sixth Amendment does not guarantee the defendant a "meaningful relationship" with his attorney. *Id*. at 14.

The Court appointed the public defender to represent Streets, and he therefore did not have the right to court-appointed counsel of his choice, as he had been declared indigent,  see Doc. Nos. 4, 5, 7, and could not afford to hire his own attorney. "An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate good cause to warrant substitution of counsel."  *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir.1990) (footnote and citations omitted).  Petitioner failed to do so here.

Moreover, the record is without support for Petitioner's contention that he fired his attorney. At a at the January 8, 2008 pre-trial hearing conducted on the issues between Streets and his attorney, Streets did not say he wanted to fire Nolder. *See Transcript,* Doc. No. 84.  Nor did he ever during any other proceeding state he wanted to do so. Further, assuming he was at any time after Nolder was appointed to represent him financially able to retain counsel, he did not do so. In short, the record fails to indicate Petitioner unconstitutionally was denied his right to counsel of choice.

Petitioner asserts that he was denied effective assistance of counsel during jury selection. He complains that his attorney failed to engage potential jurors in any meaningful discussion, and he further contends that his attorney improperly permitted Juror Number 50, James Conrad, to be removed for cause at the request of the prosecutor on the basis that Conrad's father worked as a driver for Putnam.  This claim likewise fails.

The Sixth and Fourteenth Amendments guarantee a criminal defendant the right to a fair and impartial jury.  *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense." *Holder v. Palmer*, 588 F.3d 328, 338 (6th Cir. 2009)(quoting *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001)).

> Counsel, however, is granted deference when conducting *voir dire*. *Hughes,* 258 F.3d at 457. "An attorney's actions during *voir dire* are considered to be matters of trial strategy. . . . A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id.*

*Id*.  The record fails to reflect such circumstances here.  The transcript of *voir dire* proceedings indicates that the government requested Conrad to be removed for cause because his father

worked as a driver for Putman, the alleged victim, for thirty-six years. *Trial Transcript*, Vol. I, PageID #495-96; 559. Counsel exercised a reasonable strategic decision not to oppose the government's request for removal of this juror. Even if he did not (a conclusion the Magistrate Judge does not reach), Petitioner cannot establish prejudice from counsel's decision. The record does not support Petitioner's claim that his attorney conducted an inadequate *voir dire*.

Petitioner complains that his attorney failed to have *Defense Exhibit A*, which would have established the time frame that Loeser allowed Putnam Logistics to handle the Hankook account, admitted into evidence, Streets complains that his attorney failed to subpoena trip records for each Hankook shipping request to establish his innocence. Streets asserts that his attorney conducted a hasty examination when he testified on his own behalf and seemed more interested in completing the trial as soon as possible. Petitioner additionally asserts that his attorney performed in a constitutionally ineffective manner when he failed to conduct a re-direct examination of him.

The prosecution objected to admission of the records contained in *Defense Exhibit A*. Nolder initially attempted to establish that the documents as admissible business records, but was unable to do so. He then withdrew his request for admission of the records, stating that he could accomplish what he needed to accomplish without "burdening the Court" and moved forward. *See Trial Transcript*, Vol. V, PageID #895- 899. Petitioner has failed to demonstrate that the records were admissible, and nothing in the record demonstrates that the Court would have permitted admission of *Defense Exhibit A* was admissible. Moreover, Petitioner cannot establish prejudice, as he testified regarding the records at issue, and the government did not object to this testimony. *See Trial Transcript,* Vol. V, PageID #889-900.

Nolder indicates that he made no argument for admission of *Defense Exhibit A*, which included Hankook records mailed to Putnam, because Streets was not the records custodian and therefore the records were inadmissible as defense records.  Nolder states that he decided against asking any questions of Streets on re-direct examination, due to his "poor performance" on cross-examination.  *Affidavit of Steven Nolder, see Exhibits to Return of Writ.*

> On direct examination, Streets identified language ("SLC") on the memo portion of a check/invoice as evidencing his payment to a factoring company named "SLC" for a load of tires that were delivered by Deborah Pounds.  In trial preparation, I questioned Streets about this conclusion and I noted that I was suspect about his explanation because of the "principal only" notation on one of the checks in question; nonetheless, he was resolute.  However, on cross-examination, Streets was impeached and admitted that this language was not evidence of a payment to a factoring company; instead it was a payment for a delinquent student loan debt ("SLC" was the abbreviation for "Student Loan Commission").  This impeachment was a watershed moment in the trial, in my opinion, and I wanted to complete his testimony without affording the government any additional opportunities to impeach Streets's credibility.

*Id.*  Thus, counsel's decision not to conduct re–direct examination constituted a reasonable strategic decision.

Petitioner complains that his attorney unconstitutionally failed to have various exhibits admitted into evidence. He further argues that his counsel should have moved for  a mistrial after the jury rendered its verdict without having copies of all of exhibit numbers 77 and 79 with them during their deliberations.  Exhibit 77 included checks written by the defendant to Putnam to compensate it for deals that were co-brokered.   He complains that his attorney failed to offer into evidence all of the signed business agreements or contracts between Howard and Putnam or Loeser and other companies Howard associated with during the time frame at issue. Specifically, Petitioner complains that his attorney failed to enter into evidence Howard's filing

records and a letter from Loeser to Howard. He complains that his attorney failed to call as a defense witness James Streets. *Petition*, PageID #1870. Petitioner additionally complains that his attorney failed to include in defense exhibits introduced at trial "the 33k loss leveled by Hankook to Howard" from a load Howard co-brokered to Putnam. According to Petitioner, Putnam failed to file with the carrier's insurance a claim, so Howard back-charged the 33k loss to Putnam until it was resolved. The loss occurred in January 2002 and October 2002. Petitioner also complains that his attorney failed to enter into evidence the "US Dot/FMCSA records for Howard, Putnam, Loeser and Translogistics, establishing his innocence. Petition, PageID #1869-70.

In response, Nolder indicates that he did not move for a mistrial when it was discovered that government exhibits 77 and 79.13 were not considered by the jury during its deliberation, because the two transactions reflected in the exhibits in question were not disputed by the parties.

> Group Exhibit 77 was an exhibit that showed that Streets or his companies paid Putnam $13,720 along with the invoices that accompanied these payments. Exhibit 79.13 was a photocopy of a check from Hankook to Howard Logistics for $11,292.58. The transactions reflected in [these documents] was referenced in counsels' closing arguments and there was no question or dispute that the payments were made by Streets to Putnam or by Hankook to Howard Logistics. Additionally, Streets, on direct examination, admitted making three payments to Putnam in the amount of $13,720 and these three payments were also summarized in Government Exhibit 83.3. Government Exhibit 79.13 also was admitted to the jury as part of Government Exhibits 68.6, 69.6, 70.6, 71.6, 73.6, 74.6, and 76.6. I didn't move for a mistrial because neither side disputed the transactions, they were discussed in trial testimony, were referenced in closing arguments, and were summarized in other exhibits that were delivered to the jury.

*Affidavit of Steven Nolder, see Exhibits to Return of Writ*. Because there was no dispute regarding the checks contained in the exhibits not delivered to the jury for use during their

deliberations and their contents were discussed in closing arguments and summarized in other exhibits that the jurors had with them during the deliberations, Petitioner cannot establish either prong of *Strickland* based on his attorney's failure to move for a mistrial.

Nolder further states:

> I'm aware that during the course of some of the deliveries that were the subject of this prosecution, there were allegations by the warehouses where the deliveries were made that either the tire count was short or that property was damaged during the deliveries. Consequently, either Streets or his companies were responsible for the shortages or losses. There was evidence presented to the jury that Streets and/or his companies made up the shortages and/or paid the losses; however, I don't believe that the figure that Streets paid was close to $33,000.

> It is true that the "US Dot/FMCAS public records for Howard, Putnam, Loeser, and Translogistics" were not entered into evidence. . . . However, these issues were, in my mind, irrelevant to the theories of prosecution or defense, which, when simplified were[,] did Streets or his companies, in addition to Putnam, pay the delivery fees of the truckers who delivered the Hankook Tires?

*Id.*

Petitioner fails to identify the documents he maintains would have been evidence undermining the government's case, nor has he demonstrated how they would have benefitted the defense. Petitioner has not proffered James Streets' testimony, and the record does not support for his allegation that any of the witnesses he refers to would have provided exculpatory evidence for the defense. All of Petitioner's allegations fail under the two-prong *Strickland* test.

Petitioner asserts that he was denied effective assistance of counsel because his attorney failed to object to improper comments by the prosecutor during closing argument. Specifically, He complains that the prosecutor misstated, during closing argument, that the case against

Petitioner was similar to that of Martha Steward in that she was found guilty, thereby inferring that he also was guilty of a similar crime. *Petition,* PageID #1871. The comment referred to is as follows: ". . . you're not supposed to lie to the FBI. Just ask Martha Stewart, see what happened there." Nolder, in his affidavit, agrees that this comment was inappropriate. He indicates, however, that he made a decision not to object to the isolated reference, so as not to "run the risk that undue attention would be drawn it." He believed that the jury would not be influenced by this isolated remark if no further attention was drawn to it by an objection. *Affidavit of Steven Nolder, Exhibit 1 Return of Writ.* Nolder is an experienced criminal defense attorney. Petitioner has offered no convincing argument to conclude that his trial judgment that an objection to this one isolated remark would cause more harm than good to the defense denied him the effective assistance of counsel. "Actions or omissions by counsel that might be considered sound strategy do not constitute ineffective assistance of counsel." *Stinson v. United States*, 102 F.Supp.2d 912, 198 (2000)(citation omitted).

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that the instant § 2255 motion be **DENIED** and that this action be **DISMISSED.**

### Procedure for Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1) (B); Rule 72(b), Fed.R.Civ.P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to de novo review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150–52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir. 1989).


                                    s/Mark R. Abel
                                    United States Magistrate Judge